**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

**GALVESTON OPEN GOVERNMENT**                 *
**PROJECT,**                                  *
                                              *
    **216 Seawall Boulevard**                *
    **Galveston, TX 77550,**                 *
                                              *
**SANDY TAYLOR,**                             *
                                              *
    **41 17th Ave. North**                   *
    **Texas City, TX 77590,**                *
                                              *
**TERRI LYNN GRIFFIN, and**                   *
**DANIEL JEROME ARVIE,**                      *
                                              *
    **7500 Emmett F. Lowery # 2803**         *
    **Texas City, TX 77591,**                *
                                              *
**on their own behalf and on  behalf of all** *
**others similarly situated,**                *
                                              *
    **Plaintiffs**                           *
                                              *
**v.**                                        *      **Civil Action No._____**
                                              *
**THE UNITED STATES DEPARTMENT**              *      **CLASS ACTION COMPLAINT**
**OF HOUSING AND URBAN**                      *
**DEVELOPMENT, and**                          *
                                              *
**SHAUN DONOVAN**                             *
**in his official capacity as Secretary of the** *
**United States Department of Housing and**   *
**Urban Development,**                         *
                                              *
    **451 7th Street S.W.**                  *
    **Washington, DC 20410,**                *
                                              *
**THE GENERAL LAND OFFICE of the**            *
**STATE OF TEXAS, and**                       *
                                              *
    **1700 Congress Ave.**                   *
    **Austin, TX 78701**                     *
                                              *
**THE STATE OF TEXAS**                        *

|  |  |
|---|---|
| | * |
| **1100 Congress Ave.** | * |
| **Austin, TX 78701,** | * |
| | * |
| **GALVESTON HOUSING AUTHORITY,** | * |
| | * |
| **IRWIN HERZ, ANTHONY BROWN,** | * |
| **ANN MASEL, J.T. EDWARDS, and** | * |
| **VIRGINIA FRENCH** | * |
| **in their official capacity as members of** | * |
| **The Board of Commissioners of Galveston** | * |
| **Housing Authority** | * |
| | * |
| **4700 Broadway** | * |
| **Galveston, TX 77551** | * |
| | * |
| **THE CITY OF GALVESTON, and** | * |
| | * |
| **LEWIS ROSEN, RUSTY LEGG, MARIE** | * |
| **ROBB,    TERRILYN    TARLTON,** | * |
| **CORNELIA    HARRIS-BANKS,** | * |
| **NORMAN PAPPOUS, and ELIZABETH** | * |
| **BEETON** | * |
| **in their official capacity as members of the** | * |
| **Galveston City Council** | * |
| | * |
| **823 Rosenberg** | * |
| **Galveston, TX 77553** | * |
| | * |
| **TEXAS DEPARTMENT OF HOUSING** | * |
| **AND COMMUNITY AFFAIRS** | * |
| | * |
| **221 East 11th Street** | * |
| **Austin, TX 78701** | * |
| | * |
| **Defendants.** | * |

       \*   \*   \*   \*   \*   \*   \*

## PLAINTIFFS' ORIGINAL PETITION

## I. PRELIMINARY STATEMENT

1.    This is a civil rights case brought by minority residents and members of other protected classes who are eligible to live in the City of Galveston's public housing on behalf of themselves and similarly situated families, as well as the families who, in the years to come, will

be residents of the City of Galveston's public housing in the future and the families who in the past have been residents of the City of Galveston's public housing.

2.      Defendants' public housing plan is to rebuild public housing units in the same location as before their destruction by Hurricane Ike and mitigate the obvious violations of the federal law therefrom by planning to build at some unknown future point in time additional public housing units at so far unknown and undefined scattered locations throughout the City of Galveston.  The locations selected by the Defendants are among the poorest in Galveston County and offer limited opportunities for the advancement of the residents.  Not only does the plan not affirmatively further fair housing the plan actively creates concentrations of poverty in already impoverished areas.

3.      Public housing programs have a long history of promoting segregation, *see generally Walker v. H.U.D.*, 912 F.2d 819, 822 (5th Cir. 1990) (writing that the Dallas Housing Authority has "traditionally operated its housing program to prevent blacks from moving into white areas of the city, and it purposefully maintained separate, racially identifiable housing projects.") Additionally, Defendant Department of Housing and Urban Development (hereinafter "HUD") has historically acted "in concert and in cooperation with [local housing authorities] for the purpose of and with the effect of maintaining racial segregation." *Findings and Conclusions: Vacation of the 1987 Consent Decree*, *Walker v. H.U.D.*, 3:85-CV-1210-R (N.D. Tex. 1996).

4.      Defendants' plans in the present case are not so different from the situation described in *Walker*. Here, Defendants intend to build public housing units in impoverished and racially segregated neighborhoods, once again engaging in intentional discrimination. The selected sites all are within the City of Galveston despite rulings by sister courts as well as the Supreme Court suggesting that the duty to affirmatively further fair housing requires the local

housing authority to look beyond the city limits. *See generally Hills v. Gautreaux*, 425 U.S. 284, 299 (1976) (holding "[t]he relevant geographic area for purposes of the respondents' housing options is the Chicago housing market, not the Chicago city limits.") *See also Thompson v. H.U.D.*, Civ. Act. No. MJG-95-309 (D. Md. 2006) (holding "HUD must take an approach to its obligation to promote fair housing that adequately considers the entire Baltimore Region.") As occurred in Baltimore, Defendants now seek to use the city "as an island reservation for use as a container for all of the poor" of the entire county.

5.      The sites selected by Defendants also present environmental hazards to potential residents. The soil and groundwater of the sites are contaminated from former on-site use. Additionally, the sites selected will place residents at risk from hurricanes, wind, and floods. Defendants will claim their plan mitigates the dangers of building in a floodplain on a barrier island by raising the first living floor level to 11-12 feet above sea level.  This utterly fails to mitigate the danger because the plan ignores the fact that the impoverished residents of the public housing units would be surrounded by flooding and chaos when the next hurricane hits. This would either subject residents to a frightful experience wherein—although they and their property and housing may be physically safe in developments raised above sea level—everything around them that is needed to support a community, like employers, grocery stores, pharmacies, gas stations, daycare facilities, etc., could potentially be destroyed or place a great responsibility on government to evacuate and care for displaced residents during the storm and for an undetermined time after.

6.      Plaintiffs ask this Court to halt the Defendants' plans that intentionally and deliberately perpetuate systemic segregation in the City of Galveston. Plaintiffs additionally ask this Court to require Defendants to act according to the Fair Housing Act in their plans for the

development of public housing for the City and County of Galveston and to adhere to their own minimal standards for determining locations that affirmatively further fair housing as set forth in 24 C.F.R. 941.202.

7.      Defendants HUD and GLO have worked in concert to ensure the implementation of their intentionally illegal plan by threatening to withhold needed disaster relief funds from the City of Galveston if their plan does not go through. If not stopped by this Court, Defendants will intentionally rebuild public housing in such a way as to perpetuate segregation and a cycle of poverty for generations of families well into the future.

## II. JURISDICTION

8.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1337 in that this action arises under the Constitution and laws of the United States; by 28 U.S.C. § 1343 (a) (3) because the Plaintiffs seek to redress the deprivation of rights secured by the Constitution and Acts of Congress provided for equal rights; and by 28 U.S.C. § 1343 (a)(4) because the Plaintiffs seek equitable and other relief under Acts of Congress protecting civil rights, including the Civil Rights Act of 1871, as amended, 42 U.S.C. §§ 1981, 1982 and 1983.

9.      Civil actions are also authorized by 42 U.S.C. § 3613 and other provisions of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 et seq. Actions for review under the Administrative Procedure Act against the federal Defendants are authorized by 5 U.S.C. §§ 701 et seq.

10.     Declaratory and injunctive relief are sought as authorized by 28 U.S.C. §§ 2201 and 2202.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as this is the district in which the Plaintiffs' claims arose.

## III. PARTIES

A. Plaintiffs

12.     Plaintiff Galveston Open Government Project (hereinafter "GOGP") is an educational and charitable organization that was organized to examine and critique local government and suggest ways to "improve its accountability to the voters." *Mission Statement*, Galveston Open Government Project, *available at* http://www.galvestonogp.org/. Their goals are to investigate and report on irregularities in city government, to apply for grants to fund projects that the City had ignored, to work toward restructuring city government, and to build public awareness and support for the idea of an officer of public integrity within the Galveston County District Attorney's Office.

13.     Though not part of its original goals, in 2009, GOGP's supporters requested that it participate in Galveston's public housing controversy. GOGP began educating itself on the issues surrounding public housing, dedicating its time and resources to this issue and abandoning its other goals. Since that time, GOGP has been unable to concentrate on its goals of reforms of city government due to its focus on the public housing issue. After a thorough analysis was completed, GOGP came to the position that Defendants' plan to build on the site of the destroyed units was intentionally discriminatory and failed to affirmatively further fair housing. GOGP engaged in public debate to attempt to influence the City Council on this issue to no avail.

14.     Plaintiff Sandy Taylor is a 34-year-old African American woman and resident of Galveston County. She was born and raised in public housing in the City of Galveston and lived there until Hurricane Ike struck the island. While living in public housing, she was addicted to drugs and suffered from the lack of opportunity and poor conditions found in public housing. Since moving out of public housing, as a result of the storm, she found a place to live that

participates in HUD's Section 8 tenant-based voucher program in Texas City. The opportunities available to her outside of the City of Galveston allowed her to get off drugs and find gainful employment. Ms. Taylor would like to get back into public housing but not if it is located in the City of Galveston. She has learned that Texas City is a better environment for her and her family and does not want to move her family back to the old neighborhood where Defendants plan to build public housing.

15.     Plaintiffs Daniel Jerome Arvie and Terri Lynne Griffin are African American and the parents of three children—one child in elementary school, one in middle school, and one in high school. They currently reside in Texas City and receive Section 8 housing assistance. Mr. Arvie is currently unemployed and is looking for work. Though Mr. Arvie and Ms. Griffin may want to move their family into public housing, they do not want to be forced to move into currently proposed public housing sites in the City of Galveston. Mr. Arvie is concerned about safety and crime in Defendants' proposed locations. Mr. Arvie has been the victim of several property crimes while visiting friends or performing volunteer work at Galveston's public housing developments. He has had his car tires stolen and his car windows broken when his car was parked outside of Defendants' public housing developments. Another time, his car was caught in gunfire and received several bullet holes. Mr. Arvie does not want to move his family to such a dangerous neighborhood.

16.     Additionally, Mr. Arvie is concerned about his work prospects should he be forced to move to any part of the City of Galveston. Mr. Arvie is currently looking for work in Texas City without success and knows it would be more difficult for him to find work in the City of Galveston where there is little or no job growth. He is also is concerned about the lack of opportunity in the City of Galveston for his children.

B. Defendants

17.     Defendant HUD is an executive department of the United States created by Congress pursuant to 42 U.S.C. § 3532. HUD is responsible for the administration, funding and supervision of federal low-income housing programs, including the public housing, Section 8 Housing Assistance, and Community Development Block Grant programs. HUD was created to administer the U.S. Housing Act of 1937, 42 U.S.C. §§ 1437 et seq. and other federal housing programs.

18.     The United States Housing Act authorizes HUD to provide federal assistance to local public housing agencies for the development and operation of public housing. 42 U.S.C. § 1437, subsection (b) and (c). Local housing authorities' development and operation of public housing projects is financed by HUD and its predecessor agencies, subject to HUD oversight and approval, and governed by federal law and regulations, including specifically the selection of sites for the construction and acquisition of new public housing and tenant selection and assignment policies.

19.     Defendant Shaun Donovan is sued in his official capacity as Secretary of HUD. He is responsible for ensuring Defendant HUD's compliance with the Constitution and laws of the United States.

20.     Defendant the General Land Office of the State of Texas is responsible for dispersing HUD money for public housing and is the State's representative to ensure compliance with the Fair Housing Act by local housing authorities including the GHA.

21.     Defendant GHA was formed on April 18, 1940 by Galveston's Board of Commissioners. It provides housing to low income residents of the City and County of

Galveston. Prior to Hurricane Ike, it operated 900 public housing units and administered 1,213 housing choice vouchers.

22.     Defendants Irwin Herz, Anthony Brown, Ann Masel, J.T. Edwards, and Virginia French, are sued in their official capacities as members of the Board of Commissioners of Galveston Housing Authority.

23.     Defendant the City of Galveston was Incorporated in 1839. The City is responsible for ensuring compliance with the Constitution and laws of the United States within the City. The Mayor appoints the GHA Board of Commissioners.

24.      Defendants Lewis Rosen, Rusty Legg, Marie Robb, Terrilyn Tarleton, Cornelia Harris-Banks, Norman Pappous, and Elizabeth Beeton are sued in their official capacities as members of the Galveston City Council. They have oversight responsibility for compliance with the Fair Housing Act within the City.

25.     Defendant Texas Department of Housing and Community Affairs (hereinafter "TDHCA") participated in the drafting of the Conciliation Agreement in *Texas Low Income Housing Information Service v. Texas*, No. 06-10-0410-9, which has been used by the Defendants and others as a legal imperative to rebuild public housing within the City of Galveston and in its worst neighborhoods. TDHCA was the State agency with the responsibility to grant or deny tax credits for the Cedar Terrace site, and TDHCA agreed to help finance this project.

## IV. CLASS ACTION ALLEGATIONS

26.     Plaintiffs bring this action on behalf of themselves and all other persons similarly situated pursuant to Rule 23, subsections (a) and (b)2 of the Federal Rules of Civil Procedure.

27.     The class consists of every minority person or member of a protected class who presently resides in public housing in the City of Galveston and every member of a protected class throughout Galveston County who will reside in public housing in the County in the future.

28.     This is a proper class action in that:

    a.  The Class is so numerous that joinder of all members is impractical. Defendants seek to build 569 units of public housing in the City of Galveston. An overwhelming majority of the heads of those households who would be served by public housing are racial minorities.

    b.  There are questions of law and fact common to the class, including the legality of Defendants' plans, which will result in the segregation of minority families in public housing units in predominately minority neighborhoods.

    c.  The claims of the Plaintiffs are typical of those of the class, and they will fairly and adequately protect the interests of other class members. Plaintiffs' counsel is experienced in federal court class action litigation, including civil rights litigation.

    d.  The Defendants, in perpetuating segregated public housing in the City of Galveston on the basis of race and minority status and in violation of the Constitution and laws of the United States, have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final equitable and declaratory relief with respect to the class as a whole.

### V. FACTUAL ALLEGATIONS AND A BRIEF HISTORY OF GALVESTON

29.     The history of the City of Galveston is closely tied to that of the Port of Galveston. As the Port grew to become the second largest port on the Western Gulf, the city

prospered, becoming a center of commerce and culture. It served as a capital of the Republic of Texas and was its largest city.

30.     The catastrophic 1900 Storm devastated Galveston, killing at least 6,000 people in the city alone. The 1900 Storm was the deadliest natural disaster in the nation's history. To protect itself from future hurricanes, the grade of the city was raised as much as 17 feet in some places, and the seawall was built. Yet even with these feats to protect the city, efforts were made to find a safer location for the area's primary port. The city could not compete with the protected anchorage that Houston offered 50 miles off the Gulf. With the opening of the Houston Ship Channel in the early 20th century, Galveston's decline was set in motion.

31.     As the Port of Galveston faded in importance, the city turned to tourism, illegal gambling, bootlegging, and prostitution. Meanwhile, the Galveston Housing Authority, created in 1940, brought public housing to the city. As the city held 75% of the county's residents, it was an obvious and reasonable place to build public housing. The Seawall and the efforts to raise the city had allowed Galveston to weather several hurricanes after 1900. The city was still a center of commerce and population, so it appeared as though it could still offer opportunity to its residents.

32.     Yet after World War II, Galveston experienced a population decline similar to cities across the country as residents moved to suburbs for newer houses, bigger yards, and better schools. When the State closed the city's illegal casinos in 1957, the economy took a further dive, which increased emigration from the city. A few years later, the Johnson Space Center was built just north of Galveston County's border, encouraging businesses to relocate to the mainland.

33.     By the 1970s, the prosperity that had blessed Galveston in its early days was nowhere to be found. Galveston became a city of limited opportunity in a state that was booming. As Galveston's population dwindled, that of Texas more than doubled. Galveston became a dying and impoverished city.

34.     On September 13, 2008, Hurricane Ike struck Galveston. Between 6,000 and 9,000 residents decided not to return to Galveston after the storm. For them, as for many over the past 50 years, more opportunity and far less risk were to be found elsewhere. Among the devastation the storm caused, which cannot be overstated, the storm destroyed 569 public housing units in Galveston.

35.     The destruction of the family public housing units by Hurricane Ike gave the people of Galveston a once-in-lifetime opportunity to start with a clean slate and decide how to properly select the best locations for public housing. But the decision to build public housing back where it once stood squandered this opportunity. The recovery efforts of GHA include a plan to build 141 public housing units on the very sites where some of the destroyed units stood—in segregated and impoverished neighborhoods—prior to the storm and 388 replacement units scattered throughout the island. Yet the public housing originally developed on those sites were built in a time of de jure segregation. The neighborhoods remained segregated from the time of their original building until today. By planning to rebuild public housing on this land, Defendants seek to continue to the long history of racism and segregation in public housing.

36.     Though HUD's duty is to affirmatively further fair housing and encourage integrated housing—see generally *N.A.A.C.P.*, 817 F.2d at 155—HUD approved GHA's plan to rebuild some of the 569 destroyed units in impoverished neighborhoods in a low-income city. In making and approving this plan, Defendants have acted in concert to intentionally discriminate

against the racial and ethnic minorities that will make up most of the residents of the Magnolia Homes and Cedar Terrace developments.

37.     Defendants' plan puts public housing units back in some of the most segregated and most impoverished neighborhoods in the city, in a city which already has a high concentration of low-income and minority residents, offering poor opportunities for Plaintiffs to bring themselves out of poverty and failing to affirmatively further fair housing. The first development known as Cedar Terrace is slated to be rebuilt in a census tract with 61% of its residents living in poverty. Defendant GHA anticipates that the Cedar Terrace and Magnolia Homes public housing developments will house the families that had to be evacuated from Hurricane Ike, which are 80% African American and 12% Hispanic. Meanwhile, the demographics of the tract where the development is to be built currently stand at 60% African American and 34% Hispanic. This same census tract contains an apartment complex known as Sandpiper Cove where all 192 units are financed with project-based vouchers—an alternative form of public housing. Sandpiper Cove is the source of the highest concentration of crime in the City, a fact which should be enough by itself to make the neighborhood totally unsuitable for additional public housing units. Defendants' plan to rebuild in this neighborhood will concentrate minorities and serve to further segregate the City of Galveston.

38.     Defendants' purposeful action denies public housing residents admission to non-impoverished, integrated neighborhoods and has the effect of segregating low-income minorities to low-income minority neighborhoods in violation of 24 C.F.R. 941.202(c)(1). Defendants have knowingly created, promoted, and funded segregated housing in the City of Galveston, have failed to disestablish racial segregation, and have taken action with the intent and effect of maintaining patterns of racial segregation and intensifying the separation of the races in the City

of Galveston. Defendants HUD, GHA, and the City of Galveston were sued by a similar class in *Ethridge v. Housing Authority of the City of Galveston*, No. G-96-404 (S. D. Tex. 1997).

39.     Additionally, the City of Galveston as a whole is a poor location for public housing. The City of Galveston has 22.3% of its residents living in poverty, opposed to 14.7% in Galveston County as a whole. U.S. Census Bureau, *State & County Quick Facts for Galveston (City), Texas*, *available at* http://quickfacts.census.gov/qfd/states/48/4828068.html, *and* U.S. Census Bureau, *State & County Quick Facts for Galveston County, Texas*, *available at* http://quickfacts.census.gov/qfd/states/48/48167.html. The City of Galveston also has a higher concentration of public housing residents than any other city in Southeast Texas.

40.     Galveston's geography also makes it an unattractive site. Defendants' plan exposes Plaintiffs and class members to danger and risks their health, safety, and welfare as it places all public housing in a floodplain and an area prone to severe damage from tropical storms and hurricanes. Though the risk of damage from tropical storms and hurricanes would exist in any proposed public housing site along the Gulf Coast, the hazard is much greater on a barrier island such as Galveston. The Code of Federal Regulations states that public housing may not be placed in areas experiencing adverse environmental conditions, such as flooding. 24 C.F.R. 941.202(e).  The City of Galveston, located on a barrier island in the Gulf of Mexico, is an area prone to flooding and obviously did flood as recently as five years ago, thus necessitating the current rebuilding effort. On average, Galveston is affected by tropical storms or hurricanes every 2.66 years and received a direct hit from a hurricane every 8.29 years.

41.     With both an extremely high risk from hurricanes and the continual emigration from the city due to greater opportunity and less risk offered by the mainland suburbs, the Defendants seek to continue to maintain a reservation of poverty conveniently segregated on an

island away from the affluent part of the County. By approving and funding the local Defendants' plan, the federal Defendant and the GLO are consciously and knowingly continuing the practices that maintain residential segregation in the City and County of Galveston and place Plaintiffs in harm's way in violation of their duties to affirmatively further fair housing and to place public housing sites in areas free from adverse environmental conditions.

## VI. CLAIMS FOR RELIEF

A. Count one: Violations of the United States Constitution

42.     The Defendants have, as described above, intentionally perpetuated and refused to disestablish racial segregation in the City of Galveston and Galveston County in violation of Plaintiffs' and class members' rights under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1981, 1982, and 1983.

B. Count two: Violations of Title VIII

43.     The Defendants have, as described above, perpetuated and refused to disestablish racial segregation in the City of Galveston and Galveston County and failed to act affirmatively to further fair housing opportunities in violation of Plaintiffs' and class members' rights under the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 et seq.

C. Count three: Violations of Title VI and HUD Regulations

44.     The Defendants have, as described above, excluded Plaintiffs and class members from participation in, denied them the benefits of, and subjected them to discrimination under programs receiving federal financial assistance, on account of Plaintiffs' and class members' race and ethnicity in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and HUD implementing regulations, 24 C.F.R. §§ 1.1 et seq.

D. Count four: the Administrative Procedure Act

45.     The federal Defendant has abused its discretion and otherwise acted contrary to law in authorizing, permitting, and supporting the perpetuation of segregated public housing in the City of Galveston and in failing to consider all relevant factors in carrying out their responsibilities, thus calling for relief from this Court pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 701 et seq.

*a. Violations of 24 C.F.R. § 941.202*

46.     Plaintiffs and class members are further adversely affected and aggrieved by the federal Defendant's actions. Defendants' plan for recovery from Hurricane Ike is to rebuild public housing in prohibitively poor neighborhoods and in impoverished and environmentally dangerous areas of the City of Galveston and Galveston County, in violation of the site and neighborhood standards detailed 24 C.F.R. § 941.202.

47.     Subsection (b) of § 941.202 requires that the location of public housing "be suitable from the standpoint of facilitating and furthering full compliance with the applicable provisions of Title VI of the Civil Rights Act of 1964, Title VIII of the Civil Rights Act of 1968, E.O. 11063, and HUD regulations issued pursuant thereto." 24 C.F.R. § 941.202(b). As explained above, Defendants have failed to comply with Title VI of the Civil Rights act of 1964 in that they have subjected Plaintiffs to discrimination in connection to their receipt of federal benefits.

48.     Additionally, subsection (c) prohibits housing authorities from constructing public housing in "area[s] of minority concentration" unless certain criteria are met. *Id*. at 24 C.F.R. § 941.202(c). It additionally only allows the construction of replacement units on an original site after demolition if "(i) The number of public housing units being constructed is no more than 50 percent of the number of units in the original project; (ii) In the case of replacement of a

currently occupied project, the number of public housing units being constructed is the minimum number needed to house current residents who want to remain at the site; or (iii) The public housing units being constructed constitute no more than twenty-five units." Subsection ii is not applicable as the projects are not currently occupied. Defendants plan to replace more than 50% of the original units at the Magnolia Homes site, which is comprised of more than 25 units. As such, their plan violates subsections (i) and (iii) of § 941.202(c).

49.     Subsection (d) states that housing sites "must avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons." *Id*. at § 941.202(d). Public housing must be constructed in locations that "promote greater choice of housing opportunities and avoid undue concentration of assisted persons in areas containing a high proportion of low-income persons." *Id*. As explained above, Defendants' plan does just the opposite. It places 569 more families in impoverished locations. It further concentrates public housing, as their plan places additional public housing near Sandpiper Cove, where all 192 apartments units are financed with project-based vouchers, and in other areas of a city with very high concentrations of public housing.

50.     Moreover, subsection (e) states that the sites for public housing "must be free from adverse environmental conditions, natural or manmade, such as instability, flooding, septic tank back-ups, sewage hazards or mudslides; harmful air pollution, smoke or dust; excessive noise vibration, vehicular traffic, rodent or vermin infestation; or fire hazards." *Id*. at § 941.202(e). Plaintiffs and class members are adversely affected and aggrieved by the federal Defendant's plan to rebuild public housing on the sites where prior homes were flooded and destroyed during Hurricane Ike, thus forcing Plaintiffs and class members to live in an area prone to flooding. Moreover, both sites Defendants selected for mixed-income development are in

industrial areas and not suitable for residential development. In approving this plan, the federal Defendants have adversely affected and aggrieved Plaintiffs and class members.

51.     Finally, subsection (g) states that the sites for public housing "must be accessible to social, recreational, educational, commercial, and health facilities and services, and other municipal facilities and services that are at least equivalent to those typically found in neighborhoods consisting largely of similar unassisted standard housing." *Id*. at § 941.202(g). The sites selected lack access to these necessities, and Plaintiffs are adversely affected and aggrieved by this lack of access.

   *b. Violations of Executive Orders*

52.     Executive Order 12,898 of February 11, 1994 addresses environmental justice in minority and low-income populations. It commands Federal agencies to "make achieving environmental justice part of its mission." Exec. Order No. 12,898 § 1-101, 59 Fed. Reg. 7629 (Feb, 11, 1994). Each Federal agency is commanded to "conduct its programs, policies, and activities that substantially affect human health or the environment, in a manner that ensures that such programs, policies, and activities do not have the effect of [] subjecting persons (including populations) to discrimination under, such programs, policies, and activities, because of their race, color, or national origin." *Id*. at § 2-2. The Executive Order further seeks to promote environmental justice through the enforcement of all health and environmental laws "in areas with minority populations and low-income populations." *Id*. at § 1-103. Additionally, Executive Order 11,988 as amended by Executive Order 12,148 commands every agency to "take action to reduce the risk of flood loss [and] to minimize the impact of floods on human safety, health and welfare." Exec. Order No. 11,988 § 1, 3 C.F.R. 1977 (May 24, 1977). In fact, Executive Order 11,988 directs Defendants to conduct an extensive search for alternative sites outside of the

floodplain and, after such a search, to consider building in the floodplain only if there are no alternative sites available. In the present case, there are dozens of sites available on the Mainland that would minimize any flood risk and would also be located in high-opportunity census tracts, as required to affirmatively further fair housing. The GLO conducted the 8-step analysis required by Executive Order 11988 in a fraudulent manner by concluding that "one of the prime site selection criteria for the Project is that it must be located within the city limits of Galveston" which is entirely untrue. There is no such constraint, and such a criterion flies in the face of the requirements to use a regional approach and not to restrict locations to any particular city limits. This fraudulent 8-step analysis conducted by the GLO on behalf of all of the Defendants continues to show that the Defendants have chosen these sites for political and financial reasons and that they continue to bend the rules to justify building in these unlawful locations.

53.     Defendants by their plans and actions violate these Executive Orders. By placing or planning to place low-income housing in floodplains, Defendants fail to reduce the risk of flood loss and fail to minimize the impact of floods on human safety, health, and welfare. By placing or planning to place low-income housing in contaminated sites, Defendants are adversely affecting the health of the minority population and subjecting the population to discrimination.

## VII. REQUEST FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court:

a.   Certify this action as a class action on behalf of the proposed class pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure;

b.   Pursuant to 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure, declare that Defendants' policies, practices, acts, and omissions,

have deprived Plaintiffs of their rights under the Constitution and the laws of the United States, as enumerated in Counts One through Four;

c.   Pursuant to Rule 65 of the Federal Rules of Civil Procedure, enter preliminary and permanent injunctive relief ordering the Defendants to immediately cease their violations of Plaintiffs' rights and to remedy the effects of their violations;

d.   Award equitable relief to the Plaintiffs and the class to remedy the effects of the Defendants' discriminatory acts and omissions, to restore the Plaintiffs and the class to the positions they would have enjoyed had housing assistance been provided in a nondiscriminatory manner free from segregation, and to ensure that sufficient and comparable opportunities for public and assisted housing are provided to them outside areas of poverty and minority concentration. Such a remedy must be sensitive to opportunity—opportunity is to be determined by considerations including but not limited to the quality of schools, the availability of public transportation, the availability of other social services, local employment opportunities—and be metropolitan-wide or regional to be successful. The remedy should provide a structured choice to public housing residents, and not force their concentration. The remedy must include a mixture of site-based and mobility based options to affirmatively further fair housing in the region.  To do so, the remedy should include adequate supports such as pre-move counseling and housing search assistance;

e.   Order Defendants to create and submit a plan with a timeline and defined aims which will enable all parties to determine that desegregation goals are being met;

f.   Order reasonable attorneys' fees to be paid by the federal Defendants pursuant to

28 U.S.C. §§ 2412 and 42 U.S.C. 3612 and by the local Defendants pursuant to 42

U.S.C. §§ 1988 and 3612;

g.   Order the Defendants to pay the reasonable costs of this litigation; and

h.   Grant such other and further relief as the Court deems just and equitable.


Goldsberry & Associates, PLLC
3027 Marina Bay Drive, #108
League City, Texas 77573
Tel: (281) 533-3030
Fax: (281) 533-3033


__/s/ Shari Goldsberry_____
Shari Goldsberry
Attorney-in-Charge
Texas Bar No. 24038398
Fed. Bar No.:611462
Lori Elaine Laird
Of Counsel
Texas Bar No: 24046260
Fed Bar No: 584647
Emily Foster
Of Counsel
Texas Bar No: 24059768