UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| GALVESTON OPEN GOVERNMENT PROJECT, *et al*, | § § § |
| Plaintiffs, | § |
| VS. | § CIVIL ACTION NO. 3:13-CV-00439 |
| | § |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al*, | § § § § |
| Defendants. | § |

## MEMORANDUM AND ORDER

Given the number of public issues that end up in federal court, one could understandably think that just about anyone may sue over just about anything. But the Constitution only empowers federal courts to decide "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. "'One of the controlling elements in the definition of a case or controversy under Article III' is standing." *Hein v. Freedom From Religion Foundation, Inc.*, 551 U.S. 587, 598 (2007) (quoting *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 613 (1989) (Kennedy, J.)). Standing, which requires that a person bringing a lawsuit faces an actual or imminent injury that a successful suit could redress, "is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

Standing is the preliminary question in this lawsuit brought by individuals and the Galveston Open Government Project (GOGP) seeking to enjoin the reconstruction of Galveston public housing destroyed by Hurricane Ike.

## I.   BACKGROUND

### A.   The Plan to Rebuild Public Housing

More than five years have passed since Hurricane Ike wreaked devastation on the City of Galveston.  Ike's winds exceeded 100 mph and its waters flooded downtown streets with more than ten feet of water.  In yet another display of the City's historic resilience, homes and businesses have been rebuilt, tourists have returned, and life has largely returned to normal.  But the rebuilding continues. Just this month, the 166-year-old St. Mary Cathedral Basilica reopened for Easter Mass after extensive repairs to fix damage from the hurricane.

One type of housing has not yet been rebuilt.  In addition to the damage it caused to private homes, businesses, churches, and even the federal courthouse where this Court sits, Ike also destroyed 569 of the 942 public housing units that existed on the island.  The destroyed units were located at four sites: Magnolia Homes, Oleander Homes, Palm Terrace, and Cedar Terrace.  What to do in response to the destroyed public housing has generated significant public controversy, and now this lawsuit.

Money is not the problem.  The federal government appropriated billions of dollars in hurricane-relief funds to affected areas in thirteen States for "disaster relief, long-term recovery, and restoration of infrastructure, housing, and economic revitalization."    Consolidiated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Pub. L. No. 110-329, 122 Stat. 3574.  The housing funds would be distributed pursuant to the Housing and Community Development Act of 1974, which is aimed at providing decent housing for persons of low and moderate income.  As is typically the case with federal public housing funds, most of these funds would flow to state and local agencies via grants from the Department of Housing and Urban Development (HUD).  Texas Governor Rick Perry designated the Texas General Land Office (Land Office) as the state agency charged with distributing these funds within Texas and ensuring that funding recipients comply with applicable requirements.

The Galveston Housing Authority (GHA) is the local public housing agency that is seeking to use the hurricane relief funds to rebuild public housing on the island.  Its proposal calls for developing 144 public housing units on the former sites of Cedar Terrace and Magnolia Homes as part of mixed-income developments in which approximately half of the units will be private, market-rate residences.  In addition, the plan provides for 385 "scattered site" public housing properties of which 50 sites might be developed outside the City of Galveston, on

the mainland of Galveston County.   *See GHA Reconstruction Plan*, GALVESTON

HOUSING AUTHORITY, www.ghatx.org/dev_reconstruction.html (last visited Apr.

24, 2014).

### B.    This Lawsuit

The GOGP, an organization that "was organized to examine and critique

local government and suggest ways to 'improve its accountability to the voters,'"

Plfs.' Second Amended Complaint, Docket Entry No. 81 ¶ 12, and a number of

individual plaintiffs filed this lawsuit seeking to enjoin the rebuilding of units at

Cedar Terrace and Magnolia Homes.   A number of government agencies are

named as defendants: the GHA; the City of Galveston; HUD and its Secretary,

Shaun Donovan (collectively "the Federal Defendants"); and the Land Office and

Texas Department of Housing and Community Affairs (collectively "the State

Defendants").[1]

The current pleading asserts claims under the Constitution of the United

States for "intentionally perpetuat[ing] and refus[ing] to disestablish racial

segregation in the City of Galveston and Galveston County"; claims for racial and

---

[1] The original complaint also sued individual members of the GHA and Galveston City Council
in their "official capacities."   *See* Docket Entry No. 1.   Plaintiffs agreed to dismiss these
individual defendants after it was pointed out that an "official capacity" suit against a
government official is redundant when the official's public employer is also sued.   *See* Docket
Entry No. 75 (order granting dismissal); *Gaalla v. Citizens Med. Ctr.*, 2012 WL 2870701, at *4
(S.D. Tex. July 10, 2012) ("[C]laims against an individual acting in his official capacity are
properly dismissed as redundant when the entity with which the individual is associated is also a
defendant." (collecting cases)).

disability discrimination under Titles VI and VIII of the Fair Housing Act (FHA); and claims against the Federal Defendants under the Administrative Procedure Act for violation of HUD regulations and Executive Orders.  Docket Entry No. 81 ¶¶ 39–51.  Plaintiffs filed an application for a temporary restraining order.  Docket Entry No. 51.  The Court denied that request, noting both that the application did not include evidence sufficient to establish a likelihood of success on the merits and that irreparable injury was not shown given uncertainty concerning the status of construction and the availability of future relief to remedy any discriminatory effect that is proven.  *See* Minute Entry for Feb. 18, 2014.  Plaintiffs have since filed a motion for preliminary injunction with includes evidentiary support and to which the Defendants have now responded.  Docket Entry No. 58.

But before the Court confronts the motion for preliminary injunction, the Court must decide the threshold standing challenge all Defendants raise in Rule 12 motions to dismiss.[2]  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–94 (1998).

---

[2] Some of the defendants raise additional grounds for dismissal unique to their situation.  The Texas Department of Housing and Community Affairs argues that Plaintiffs lack standing to sue it under the "causation" requirement because it would only have a role in the proposed GHA development if public bonds issue to fund it, and none have.  *See* Docket Entry 89 at 25–28.  The Federal Defendants raise a number of defenses, including that claims against it are unripe and not subject to suit under the APA as "final agency actions" because HUD has not yet approved the GHA proposal;  that the non-APA claims are barred by sovereign immunity;  and that the Plaintiffs have failed to state a claim.  *See* Docket Entry No. 71. The Court will address these defendant-specific grounds for dismissal at a later date.

## II.   ANALYSIS

### A.   The Law of Standing

The standing requirement has various sources.   As mentioned above, the most fundamental source is the Constitution's limit on the jurisdiction of the federal courts.   Additional requirements may be found in statutes that restrict the type of individuals who may bring suit or in judicially-created "prudential" rules of self-restraint.   *See Warth v. Seldin*, 422 U.S. 490, 498–501 (1975) (discussing and contrasting the constitutional and prudential standing requirements).   When it comes to claims under the FHA, however, Plaintiffs must meet only the constitutional requirements because Congress intended FHA standing to "extend[] to the full limits of Article III."[3]   *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)).

To meet the constitutional minimum for standing, a plaintiff has the burden to establish the following:

---

[3] Plaintiffs also allege "violation of Plaintiffs' and class members' rights under the Fifth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1982, 1982, and 1983."   Docket Entry No. 81 ¶ 39.   Because the burden for proving discrimination in housing cases is generally higher for constitutional claims than for those brought under the FHA, it is unlikely that Plaintiffs would prevail only on the constitutional claims.   The Court therefore does not decide at this time whether prudential standing limitations might bar the constitutional claims.   *See Jackson v. Okaloosa Cty.*, 21 F.3d 1531, 1540 n.14 (11th Cir. 1994)   (noting that the Supreme Court has not decided whether neighborhood standing is appropriate for section 1982 and 1983 claims, as opposed to FHA claims, but not deciding the issue at that time based in part on the likely overlap between the claims).   And the Federal Defendants do not raise standing issues unique to the APA claims at this time, but instead raise other justiciability concerns about those claims that the Court will address in a future ruling.

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'"  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id*. (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)); *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (stating that plaintiff "bears the burden of showing that he has standing for each type of relief sought"). This "law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013). Requiring a plaintiff to meet these requirements ensures that "the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure the concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions.'" *Flast v. Cohen*, 392 U.S. 83, 99 (1968) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).   And it helps prevent "friendly suits or those which are feigned or collusive in nature."  *Id*. (citations omitted).

Plaintiffs seek to bring this case as a class action, but that does not change the requirement that named plaintiffs must have standing in their own right.  *See O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." (citations omitted)).

### B.      The Individual Plaintiffs

The Court first addresses the standing of the individual plaintiffs.

#### 1.       The Section 8 Plaintiffs

Most of the Plaintiffs—Sandy Taylor; Daniel Jerome Arvia and Terrie Lynn Griffin (who live together with their three children); and Janet Lynn[4]—currently receive housing vouchers from GHA.  Taylor, Griffin and Arvie use the vouchers to help pay for housing in Texas City.  Lynn uses the vouchers to obtain housing in Galveston.  Only Taylor alleges that she lived in Galveston public housing prior to Ike.

Their allegations concerning their interest in the rebuilding of Galveston's public housing are similar.  Arvie and Griffin allege that they "*may* want to move their family into public housing, [but] they do not want to move into the currently proposed public housing sites in low-opportunity neighborhoods, in the City of

---

[4] Another Plaintiff, Bruce Munden, who fits into this category voluntarily dismissed his claims. *See* Docket Entry No. 104.

Galveston."   Plfs.' Second Amended Complaint, Docket Entry No. 81 ¶ 16 (emphasis added).  Lynn alleges she "*would like to* be able to move into public housing, but not in the neighborhoods chosen by Defendants" because they are "unsafe, contaminated, segregated and impoverished neighborhoods."  *Id*.  ¶ 19 (emphasis added).  Taylor contends that she "*would like the opportunity to* get back into public housing, but not if it is segregated and located in impoverished neighborhoods."  *Id*. ¶ 15 (emphasis added).

The problem from a standing perspective is that the harm these Plaintiffs fear—having to live in public housing in purportedly segregated Galveston neighborhoods—is not actual or imminent (or even likely).  It certainly is not an actual injury, which is one that a party has incurred or is presently incurring.  Today they are living in various areas of Galveston County that do not have the segregation, crime, and poor employment prospects they ascribe to the Cedar Terrace and Magnolia Homes sites.  *See, e.g.*, *id*. ¶ 15 (Taylor claiming that the opportunity to live in Texas City on a Section 8 vouchers has "allowed her to get off drugs and find gainful employment."); ¶ 17 (Arvie alleging that it would be more difficult for him to find a job—and his children would have less opportunity—in Galveston as opposed to Texas City where he currently resides using a voucher). Nor is their placement in a public housing unit in Galveston with

all of the attendant ills they foresee imminent.   Understanding why requires a discussion of HUD's Section 8 voucher program.

Created by the Housing and Community Development Act of 1974, Section 8 provides rental subsidies so that eligible families can afford adequate housing in the private rental market.  24 C.F.R. § 982.1(a).  Local housing authorities enter into contracts with the owner of a rental unit, in which the owner is paid the subsidy in exchange for an agreement to comply with the terms of the program. The family pays the remaining rent.  Most of these programs are tenant-based, meaning the eligible family is allowed to select a unit among all private renters who agree to take subsidies.  24 C.F.R. § 982.1(b).  When a Section 8 family leaves a particular unit, it may "move to another unit with continued assistance so long as the family is complying with program requirements."  *Id*.; 42 U.S.C. § 1437p(o), (r).  The vouchers generally may be used anywhere in the United States where a local housing authority operates the voucher program.  42 U.S.C. § 1437f(r); 24 C.F.R. § 982.1(b); 24 C.F.R. § 982.353, 355.

Given that these Plaintiffs are current participants in the Section 8 voucher program, reconstruction of Galveston public housing is unlikely to require them to move.  With or without rebuilt public housing units on the island, the likelihood is that these Plaintiffs can continue living in their current HUD-subsidized unit or elect to move to another private complex that accepts Section 8 vouchers—a

location in the City of Galveston, Galveston County, elsewhere in Texas, or even another State.  Section 8 thus already provides these Plaintiffs with what they want: a choice in where they live.  This flexibility Section 8 affords the Plaintiffs is greater than what they would have if designated to reside in any particular public housing project, be it one located in the City of Galveston or—where they prefer—on the mainland of Galveston County.

Of course, the Court cannot say with certainty that these individuals will never end up living in rebuilt public housing in Galveston. But that same possibility cannot be foreclosed for countless others, such as a current public housing resident in Austin who may end up moving to Galveston, or a current Galveston resident with an income level above the level at which one is eligible for housing assistance but who may lose his job and end up in public housing.  But a plaintiff does not have standing to sue based on a future injury that is merely speculative.

Just last year the Supreme Court reinforced that possible—or even "reasonably likely"—future injuries are insufficient to confer standing.  *See Clapper*, 133 S. Ct. at 1138.  Attorneys, along with human rights and media organizations, brought suit challenging provisions of the Foreign Intelligence Surveillance Act that allow surveillance of non-U.S. citizens who are reasonably believed to be located outside the United States.  The plaintiffs contended that their

work requires them to "engage in sensitive and sometimes privileged telephone and e-mail communications with" individuals who are likely subjected to this surveillance. *Id*. at 1145. The court of appeals found standing based on those plaintiffs' allegation that there was an "objectively reasonable likelihood that their communications [with their foreign contacts] will be intercepted under [the challenged law] at some point in the future." *Id.* at 1146. But the Supreme Court reversed, noting that a "'reasonable likelihood standard' is inconsistent with our requirement that 'threatened injury must be certainly impending to constitute injury in fact.'" *Id*. (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). "Allegations of possible future injury do not satisfy the requirements of Article III." *Whitmore*, 495 U.S. at 158.

By no measure are the Section 8 Plaintiffs' alleged injuries "certainly impending." They argue that budgetary constraints *may* reduce Section 8 funding, *see* Docket Entry No. 82 at 11, but that typifies the conjectural injury that is insufficient for standing. What their allegations seem to come down to is that they want to live in a public housing project located in a place of their choosing. Aside from the fact noted above that Section 8 already provides them with exactly that— a subsidized unit in a locale they get to choose—this claim ignores that the constitutional and statutory claims they assert provide a right to be free of discrimination, not a right to have public housing in the neighborhood of their

choice. *See Jaimes v. Toledo Metro. Hous. Auth.*, 758 F.2d 1086, 1103 (6th Cir. 1985); *Schmidt v. Boston Hous. Auth.*, 505 F. Supp. 988, 995 (D. Mass. 1981) ("[T]here is no federally protected right to housing in a particular community."). To be sure, standing exists in the prototypical FHA case in which a plaintiff wants to purchase housing in a certain neighborhood but cannot because of racially discriminatory steering or zoning practices. *See, e.g.*, *Lincoln v. Case*, 340 F.3d 283, 289 (5th Cir. 2003) (holding that biracial couple had standing to challenge as discriminatory defendant's claim that an apartment unit was unavailable); *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1385 (5th Cir. 1986) (holding that a plaintiff who had a contract to buy a house was able to challenge as discriminatory an appraisal that prevented him for obtaining a loan for the purchase); Robert G. Schwemm, HOUSING DISCRIMINATION LAW AND LITIGATION §12A:3 (2013) (explaining that standing is "fairly easy to establish" in "'traditional' fair housing cases where individual plaintiffs claim that they have been denied a housing opportunity by the defendant because of their race or other prohibited factor").  In those cases there is an actual injury: the plaintiff would like to purchase a home in a particular neighborhood today, but cannot because of the challenged discriminatory conduct.  But here, even if Taylor (the only Plaintiff who ever resided in a Galveston public housing project) has a plausible desire to leave the Section 8 program and return to a public housing project, that plan is speculative.

Applications to reside in the public housing project are not even being accepted. What the Supreme Court has twice said in environmental cases in which plaintiffs tried to establish standing by claiming they would return to places they had earlier visited that might be affectded by the challenged regulations[5] applies here as well: "Such 'some day' intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Summers*, 555 U.S. at 496 (quoting *Lujan*, 504 U.S. at 564 (italics in original)).

For those reasons, Plaintiffs Taylor, Arvie, Griffin, and Lynn are dismissed for lack of standing. Plaintiffs' counsel contends that requiring these plaintiffs to face an actual or imminent injury is a mere "technical obstacle" and creates an impossible standard when it comes to a plan to rebuild a housing project to which no residents have yet been assigned. *See* Docket Entry No. 82 at 1–2. But the latter point disproves the former. Unless and until someone who is going to be directly affected by the rebuilt public housing believes they are suffering an injury attributable to unlawful conduct, there is no "case" or "controversy" to resolve. *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 39 (1976) ("The

---

[5] In *Lujan*, plaintiffs alleged they wanted to return to foreign countries to which they had previously travelled and viewed endangered species in a lawsuit challenging the United States' decision to not protect endangered species in programs funded in foreign countries. In *Summers*, an individual alleged he wanted to return to a national forest he had previously visited where timber might be removed pursuant to a regulation allowing small-scale timber salvaging without public notice-and-comment requirements.

necessity that the plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an Art. III requirement. A federal court cannot ignore this requirement without overstepping its assigned role in our system of adjudicating only actual cases and controversies.").

### 2. The Neighbor

Another Plaintiff, Trysha McCardell, may be such a person.  Unlike the plaintiffs who receive Section 8 vouchers and will likely continue to do so even after public housing is rebuilt in Galveston, McCardell alleges an injury from the rebuilding that relies on her current housing situation, not a speculative future one.[6] McCardell "currently lives approximately ten blocks from the proposed site of Cedar Terrace."  Plfs.' Second Amended Complaint, Docket Entry No. 81 ¶ 18. She contends that "building public housing in [her] current neighborhood—a neighborhood that is already segregated—will further add to the segregation of the neighborhood—depriving her of interracial associations." *Id*.  The demographics of the census tract where Cedar Terrace will be rebuilt are 60% African-American and 34% Hispanic. *Id*. ¶ 34.  Although the exact racial breakdown of the residents of the future sites cannot be known, the complaint alleges that it will likely mirror

---

[6] In addition to her allegations about the effect of rebuilding Cedar Terrace on the neighborhood where she currently resides, McCardell does also allege that she "received vouchers from GHA in the past and is applying to receive housing assistance again from GHA."  Plfs.' Second Amended Complaint, Docket Entry No. 81 ¶ 18.  The possibility that she will be eligible for such assistance, and that assistance will end up being provided years from now in the rebuilt Galveston public housing, is too remote to establish actual or imminent injury as a prospective resident of the public housing units.  *See supra* II(B)(1).

the "80% African-American and 12% Hispanic" breakdown that existed pre-Ike. *Id*.

To establish standing based on the effect rebuilt public housing would have on her neighborhood, McCardell relies on case law recognizing that not only those whose housing situation is affected may have standing to enforce the FHA, but so too may those living nearby who are deprived of the "social and professional benefits of living in an integrated society." *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 111 (1979). Three Supreme Court cases from the early years of the FHA applied this principle. *See* Schwemm § 12A:3 ("Another noneconomic injury is the loss of interracial associations that the Supreme Court in *Trafficante*, *Bellwood*, and *Havens* recognized in residents of an apartment complex or neighborhood whose racial makeup is being manipulated."). Standing based on this rationale was first found in a case in which two tenants of an apartment (one African-American, one white) filed suit against the apartment owner for excluding "nonwhites." *Trafficante v. Metro. Life Insur. Co.*, 409 U.S. 205 (1972). Although the two plaintiffs had not been denied access to the apartment, the Court found standing based on their asserted injuries that "they had lost the social benefits of living in an integrated community"; "had missed business and professional advantages which would have accrued if they had lived with members of minority groups"; and "had suffered embarrassment and economic

damage in social, business, and professional activities from being 'stigmatized' as residents of a 'white ghetto.'"  *Id*. at 208.

The Supreme Court next found this type of injury sufficient in a case challenging the racial steering practices of the real estate industry in which prospective purchasers were only shown homes in areas where their race predominated.  *Gladstone*, 441 U.S. at 93, 109–10.  Residents of what was described as an "integrated" neighborhood where only African-American customers were being steered brought suit, and the Court recognized an injury not only from the economic impact of having a diminished group of potential buyers, but also because of "'the importance' to a community of 'promoting stable, racially integrated housing.'"  *Id*. (quoting *Linmark Assocs., Inc. v. Willingboro Tp.*, 431 U.S. 85, 94 (1977)).

The third case was another in which residents of a neighborhood challenged racial steering practices, this time of an apartment owner.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 376–77 (1982).  By then it was well established that deprivation of the "benefit of living in an integrated society" was a legally cognizable injury that could confer standing; the contested issue was that the plaintiffs had broadly alleged a segregative effect on a metropolitan area and not pinpointed a particular neighborhood.  *Id.* at 377.  Despite the lack of such information in the pleading about the "proximity of [plaintiffs'] homes to the site

of [the] alleged steering practices," the Supreme Court could not say "as a matter of law that no injury could be proved," and remanded the case for "proof [that] might establish that they lived in areas where [the challenged] practices had an appreciable effect." *Id.* The standard is that the effects of discrimination for neighborhood standing must be felt within a "relatively compact neighborhood." *Id.* (quoting *Gladstone*, 441 U.S. at 114).

Although those cases challenged discriminatory exclusion or steering practices, lower courts have applied the "neighborhood" standing concept to cases like this one alleging that public housing units are discriminatorily being located in minority areas. Indeed, the Supreme Court cited such a case when endorsing "neighborhood standing" in *Trafficante* and *Gladstone*. *See Trafficante*, 409 U.S. at 111; *Gladstone*, 441 U.S. at 114 n.28 (both citing *Shannon v. HUD*, 436 F.2d 809, 817–18 (3d Cir. 1970) (finding that residents and a businessman of a neighborhood where HUD was going to subsidize public housing had standing to challenge the location of that public housing as discriminatory)). The primary one McCardell relies on is *Jackson v. Okaloosa County*, 21 F.3d 1531 (11th Cir. 1994), in which the court of appeals found standing for a plaintiff who lived "next door" to the proposed site of a public housing project that was allegedly being built in a county's most heavily concentrated African-American area because of bidding rules that required local approval before the project could be built in a white area.

*See id.* at 1534–36, 1539. The "segregative effect" on the plaintiff's "relatively compact" neighborhood was established because of a "substantial probability that a facility almost entirely African-American in population will be placed right next door to [plaintiff's] complex, which is itself almost entirely African-American." *Id.* at 1539. Other courts have similarly found that neighbors have standing to challenge the segregative effects of public housing. *See, e.g.*, *Alschuler v. Dep't of Hous. & Urban Dev.*, 686 F.2d 472, 477 (7th Cir. 1982) (holding that a local neighborhood association and three of its members were within the "zone of interests" Congress intended to protect under the FHA); *King v. Harris*, 464 F. Supp. 827 (E.D.N.Y. 1979), *aff'd sub nom. King v. Faymor Dev. Co.*, 614 F.2d 1288 (2d Cir. 1979), *vacated*, 446 U.S. 905 (1980), *aff'd on remand*, 636 F.2d 1202 (2d Cir. 1980) (finding that plaintiffs, individuals living near the proposed housing project and associations representing their interests, had shown irreparable harm because the proposed low-income housing project would further the creation of a low-income and minority area); *Glendale Neighborhood Ass'n v. Greensboro Housing Auth.*, 901 F. Supp. 996, 1000 (M.D.N.C. 1995) ("Plaintiffs in the case at bar have alleged that they will be injured by development of the proposed public housing project because it will result in the creation of a segregated neighborhood . . . ." (citation and internal quotation marks omitted)).

Despite this case law, Defendants challenge McCardell's ability to sue as an allegedly affected neighbor on two grounds: 1) the doctrine of neighborhood standing is no longer good law; and 2) even if it is, McCardell's allegations are not sufficient to invoke it.   Neither of those arguments convinces the Court that dismissal of McCardell's claim is warranted at this early stage of the lawsuit.

On the first issue, the Federal Defendants contend that the Fifth Circuit has never applied neighborhood standing in an FHA case.  The Court found one such case (albeit an old *per curiam* decision that has apparently not been cited by another court), in which the Fifth Circuit found sufficient the asserted injury that steering practices were depriving residents of New Orleans's Broadmoor neighborhood of the  "benefits of interracial associations" and undermining the community's "racial balance and stability."   *Broadmoor Improvement Ass'n, Inc. v. Stan Weber & Assocs.*, 597 F.2d 568, 570 (5th Cir. 1979) (per curiam) (quoting *Gladstone*, 441 U.S. at 111).  This doctrine therefore stems not just from the persuasive authority of the Eleventh Circuit in *Jackson*, but from the binding *Traficante-Gladstone-Havens* Supreme Court trilogy and *Broadmoor.*  To counter the Supreme Court cases, the Federal Defendants argue that neighborhood standing "has rarely been relied on following the pivotal standing discussions in *Lujan*, 504 U.S. 555, and *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998)."

Docket Entry No. 87 at 9.  True,[7] and it's also the case that the opinions in the three Supreme Court cases—one of which was authored by Justice Douglas (*Trafficante*) and another by Justice Brennan (*Havens*)—seem to take a less stringent view of the "injury" requirement than more recent decisions.  *See Gladstone*, 441 U.S. at 128 (Rehnquist, J., dissenting) ("I think that *Trafficante* pushed standing to the limit.").  But even if the tenor of those cases seems anachronistic, they remain good law that this Court must follow.  Likely for that reason, Defendants are unable to cite any cases rejecting the concept of neighborhood standing.

With respect to their specific challenges to its existence in this case, Defendants first contend that unlike the "next door" *Jackson* neighbor, McCardell's residence "ten blocks" from the proposed site is too distant to constitute the same "relatively compact" neighborhood that includes the proposed public housing.  We know that the proximity that existed in *Jackson* is certainly sufficient and that an entire metropolitan area may be too large, *see Havens*, 455 U.S. at 377 ("We have not suggested that discrimination within a single housing complex might give rise to 'distinct and palpable injury' throughout a metropolitan

---

[7] One exception at the court of appeals level is *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 362 (2d Cir. 2003) ("Supreme Court cases make plain that a plaintiff sufficiently establishes standing to bring suit under the FHA by alleging that a defendant's acts impinge on the plaintiff's right to live in an integrated community.").  Another is *Hamad v. Woodcrest Condominium Ass'n*, 328 F.3d 224, 231-33 (6th Cir. 2003) (holding that plaintiffs had standing because they "suffered the stigmatic harm of living in a community whose members were segregated on the basis of a prohibited classification").

area." (quoting *Warth*, 422 U.S. at 501)). But there are numerous situations between those poles where the answer is less certain. Cases make clear that the "next door" proximity of *Jackson* is not necessary as they have found greater distances could constitute the required "reasonably compact" neighborhood. Most importantly, *Gladstone* did so when it rejected the argument that neighborhood standing was limited to *Traficante*'s single apartment complex situation and held that proof could establish the necessary impact on a "12- by 13-block residential neighborhood." 441 U.S. at 113–14 ("The constitutional limits of respondents' standing to protest the intentional segregation of their community do not vary simply because that community is defined in blocks rather than apartment buildings."); *see also, e.g.*, *Fair Hous. in Huntington*, 316 F.3d at 362–63 (finding that an entire township was sufficiently compact at the pleading stage, thought noting the need for further factual development in "defining plaintiffs' 'community' or 'neighborhood'"); *Jorman v. Veterans Admin.*, 830 F.2d 1420, 1424 (7th Cir. 1987) (finding that both plaintiffs living in a 36-block neighborhood and those from an adjacent neighborhood suffered sufficient injury to challenge loan decisions as discriminatory, but finding that causation element of standing was lacking).

The Supreme Court has explained that this is not an issue on which a bright-line rule is appropriate. *Gladstone*, 441 U.S at 114 ("Various inferences may be

drawn from these and other differences. . .").  In some areas, ten blocks may

constitute a "reasonably compact" neighborhood, whereas in other areas it would

not.  *See id.* (noting that differences among types of dwellings (*e.g.*, apartment

renters versus homeowners) may affect the analysis as well as other factors).  To

name just a few, factors such as density, contiguity of residential development, the

type of housing, historic neighborhood classifications, and school zoning may

affect the size of a "reasonably compact" neighborhood.  *See id.* (noting that a

"'neighborhood' whose racial composition allegedly is being manipulated may be

so extensive in area, so heavily or even so sparsely populated, or so lacking in

shared social and commercial intercourse that there would be no actual injury to a

potential resident.").  Going back to the asserted injury itself, what matters is

whether the discriminatory practice at issue affects the neighborhood "in which the

plaintiff resides." *Havens*, 455 U.S. at 375.  That is often going to be a question on

which proof is needed.[8]  *See id.* at 377 ("Further pleading and proof might establish

---

[8] The Federal Defendants argue that *Steel Co.*, 523 U.S. at 94, means a standing issue must be
resolved once and for all at the pleading stage.  Docket Entry No. 87 at 12 n.8.  *Steel Co.* held
that courts must consider Rule 12(b)(1) jurisdictional challenges, such as standing, before
considering the merits question whether the plaintiff has stated a claim sufficient to withstand a
Rule 12(b)(6).  *See id.* at 88–89.  The Court has followed that approach here, first addressing the
standing issue raised in the Rule 12 motions in this opinion, before addressing 12(b)(6)
arguments the Federal Defendants raise.

　　But the Court does not read *Steel Co.* as doing away with the distinction between whether
standing is sufficiently *pled* and whether standing ends up being sufficiently *proven*.  *Lujan*
recognized that standing will not always be conclusively resolved at the pleading stage and must
be evaluated at "the successive stages of the litigation," 504 U.S. at 560–61, and the Fifth Circuit
has reiterated that principle post-*Steel Co.*:

that they lived in areas where petitioners' practices had an appreciable effect."); *Gladstone*, 441 U.S. at 114 ("The presence of a genuine injury should be ascertainable on the basis of discrete facts presented at trial."); *Fair Housing in Huntington*, 316 F.3d at 363 (noting the "fact-specific inquiry involved in defining plaintiffs' 'community' or 'neighborhood'").

The same is true of the Federal Defendants' argument that the allegations do not show that rebuilding Cedar Terrace would have an appreciable effect on the level of segregation in McCardell's neighborhood. Docket Entry No. 87 at 12. First, they contend that the racial makeup of the new Cedar Terrace residents is unknown, and the complaint's reliance on the demographics of the prior public housing there is unreasonable because the rebuilt housing will be mixed use and include private units not occupied by public housing tenants. They further contend that because McCardell's neighborhood is, in her view, "already impoverished and segregated," *id.*, the "case contrasts starkly" with *Jackson* in which "an 86%

---

Since they are not mere pleading requirements, but rather an indispensable part of the plaintiffs case, each element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss, we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purpose of the summary judgment motion will be taken as true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.'

*In re Deepwater Horizon*, 739 F.3d 790, 799–800 (5th Cir. 2014) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 (1996)).

minority-occupied housing project was to be located next door to the plaintiffs, in a neighborhood that was 38% minority." *Id.* (citing *Jackson*, 21 F.3d at 1534, 1539-40).   But in *Jackson*, segregative effect for the plaintiff invoking neighborhood standing was found based on the proposed "almost entirely African-American" public housing unit being placed next to a complex that "itself [was] almost entirely African-American.   *Jackson*, 21 F.3d at 1539.   As with the size of a "reasonably compact" neighborhood, no threshold can be discerned from the case law at which a neighborhood is already so segregated that standing based on impeding interracial association cannot exist.   Indeed, the two inquiries are intertwined as a "reasonably compact" neighborhood is one in which the challenged action would have a demonstrable segregative effect.   *See* Schwemm § 12A:3 ("The Supreme Court's determination to limit standing in a *Bellwood*-type 'benefits of integration' claim to residents of a particular neighborhood was prompted not only by the requirement of personal injury to the plaintiffs, but also by the requirement of causation.   The Court's opinion in *Belwood* noted that evidence about the extent and nature of the defendants' conduct in the relevant area would have to be produced to establish 'the necessary causal connection between the alleged conduct and the asserted injury.'").   For both the injury and causation standing requirements, it therefore is enough at this Rule 12 stage that McCardell's

allegation that she will suffer a segregative effect ten blocks away from the rebuilt housing units is a plausible one.

Supreme Court case law thus establishes that McCardell has made a sufficient showing at the pleading stage to allow her claim to go forward on the basis of neighborhood standing.  But—as in those Supreme Court cases—whether she will suffer a concrete injury in terms of living in a more segregated neighborhood as a result of the rebuilt public housing is an issue that will remain in the case pending further factual development.  *Gladstone*, 441 U.S. at 114-15 (concluding that "the facts alleged in the complaint . . . are sufficient to provide standing" but noting that "the adequacy of proof of respondents' standing is not before us").

### C.     The Organizational Plaintiff

An organization can also have standing to bring a lawsuit.  That standing takes two forms.  "Associational standing" exists if the organization has members who would have standing if suing in their own right, the interests at stake in the lawsuit are germane to the organization's purpose, and the participation of individual members in the lawsuit is not necessary.[9]  *Hunt v. Washington Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Ass'n of Am. Physicians & Surgeons*

---

[9] This third requirement would likely not apply in an FHA suit because it is one of the judicially-created prudential requirements.  *See Ass'n of Amer. Physicians & Surgeons*, 627 F.3d at 550–51 (citing *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996)).

*v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).  GOGP does not claim associational standing as its Certificate of Formation states that it "will have no members."  Docket Entry No. 37 at 5.

An organization without members can still have standing, however, if the organization itself satisfies the same Article III requirements of injury, causation, and redressability that apply to individuals.  This is usually done by showing that the organization has "diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and 'perceptably impaired' the organization's ability to provide its 'activities—with the consequent drain on the organization's resources . . .'  *NAACP*, 626 F.3d at 238 (quoting *Havens*, 455 U.S. at 379).  The injury must be "concrete and demonstrable."  *Id.*

Determining whether the proposed plan to rebuild Galveston public housing resulted in a concrete injury to GOGP requires a discussion of the organization's mission and activities.  As its "Open Government" name suggests, it focuses in large part on what many would consider a laudable goal: promoting transparent decision making by local government.  Its certificate of formation states that the organization is "operated for the primary purpose of studying the role of local government in [Galveston's] decline and attempting to discover ways that it might be reorganized to improve its accountability to the voters, and the operations might be made more efficient, user friendly, and beneficial to the general public, rather

than just to special interest groups; and then educating the residents on its findings." Docket Entry No. 37 at 5.[10] GOGP's website displays a cartoon drawing of a bulldog next to the phrase "A Government Watchdog Group." Galveston Open Government Project, www.galvestonogp.org (last visited Apr. 25, 2014). In light of this primary purpose of increasing government accountability, it might well have standing to challenge violations of open meeting laws or failure to

---

[10] The Certificate goes on to expand on this educational purpose and to also discuss additional charitable purposes.

Educational purposes:

The instruction of the public on subjects useful to the individual and beneficial to the community including:

a) Supporting transparency, integrity, accountability, and the rule of law in local government.
b) Educating the public on the benefits of limited government, free markets, and individual liberty.
c) Exploring the differences in local government structures and seeking the ideal type for the City of Galveston.
…

Charitable Purposes:

To address poverty, declining population, high unemployment, loss of business, and urban blight and decay through the identification of public policies that are designed to lessen neighborhood tensions; eliminate prejudice and discrimination; defend human and civil rights secured by law; and combat community deterioration.

Charitable support for the community will be accomplished by identifying policies and programs that benefit the local economy and people of all races and income levels and incentivize the rebuilding of the City's older neighborhoods and commercial districts.

The GOGP will assist individuals and groups that are not being properly served by local government, and attempt to protect their basic civil rights.

comply with open records requests, as such conduct might impair its ability to improve transparency and educate the public about local decision making.

But will it suffer a concrete injury, as opposed to "simply a setback to the organization's abstract social interests," *Havens*, 455 U.S. at 379, if the plan to rebuild public housing in Galveston goes forward?  To be sure, GOGP has stated purposes beyond its primary goal of "open government," including broad interests such as "eliminate[ing] prejudice and discrimination" and protecting "basic civil rights" that could encompass fair housing issues.  *See supra* note 10 (quoting all of the project's educational and charitable purposes).  Yet such a stated interest in an issue is not enough unless there is a concrete showing of how the allegedly discriminatory housing practice is going to impair the organization's activities.  *See Simon*, 426 U.S. at 39–40 (noting that organizations "dedicated to promoting access of the poor to health services[] could not establish their standing simply on the basis of that goal.").  There are no allegations that GOGP engages in the types of activities that often establish standing for fair housing groups: using testers to determine if property owners are engaged in discrimination, *see, e.g.,Central Ala. Fair Hous. Ctr. v. Lowder, Realty Co*., 235 F.3d 6209, 633 (11th Cir. 2000) (discussing testing activities of fair housing group); *S. Cal. Hous. Rights Ctr. v. Krug*, 564 F.Supp. 2d 1138, 1149 (C.D. Cal. 2007) ("Where a fair housing agency conducts tests or other investigatory measures to identify unlawful housing

discrimination, the agency suffers a redressable injury in court because its resources have been diverted and its mission to eliminate housing discrimination has been frustrated."); or providing referral and counseling services to low-income or minority residents looking for housing, *see, e.g., Havens*, 455 U.S. at 379 ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact."); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (finding standing for group that carried on activities providing "outreach and education to the community regarding fair housing"); *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27-29 (D.C. Cir. 1990) (finding standing for fair housing agency that counseled minority residents on housing issues).   Therefore, although the germaneness of the injury asserted to an organization's purpose is only an official element of the associational standing inquiry, *see Hunt*, 432 U.S. at 343, the D.C. Circuit has explained that establishing organizational standing is more difficult when the entity seeking standing is not engaged in actual activities related to the issue in the case:

> [I]n those cases where an organization alleges that a defendant's conduct has made the organization's *activities* more difficult, the presence of a direct conflict between the defendant's conduct and the organization's *mission* is necessary—though not alone sufficient—to establish standing. If a defendant's conduct does not conflict directly with an organization's stated goals, it is entirely speculative whether

> the defendant's conduct is impeding the organization's activities.
> Moreover, in those cases where governmental action is challenged, if
> the government's conduct does not directly conflict with the
> organization's mission, the alleged injury to the organization likely
> will be one that is shared by a large class of citizens and thus
> insufficient to establish injury in fact.

*Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (emphasis in original).

Because simply having an interest in an issue does not confer standing for an organization (just as it does not confer standing to an individual who has opinions on public issues), even organizations with a narrower focus and longer track record on housing issues have had difficulty establishing standing to bring lawsuits alleging discrimination in housing.   The Fifth Circuit found that Louisiana ACORN Fair Housing, Inc., a "nonprofit fair housing organization," lacked standing to challenge the racially exclusionary practices of an apartment complex even though it had conducted testing to determine if the owner was engaged in discrimination.   *Louisiana ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 300, 304–06 (5th Cir. 2000).  Although ACORN Fair Housing had expended resources to support the case of the individual who was not allowed to rent the apartment, its failure to "mention[] any specific projects ACORN had to be put on hold while working" on the case or "describe in any detail how ACORN had to re-double its efforts in the community to combat discrimination" was fatal.  *Id*. at 305.  More recently, the Fifth Circuit held that a Greater Austin homebuilders association

lacked standing to challenge zoning ordinances as discriminatory.  *NAACP*, 626 F.3d at 237–39.  The $15,000 the homebuilders' group spent for a prelitigation study of the ordinances' effect and on lobbying did not constitute a sufficient "injury in fact."  *Id.* at 238–39.  It was not enough that the organization alleged that the resources it "devoted to the revised ordinances could have been spent on other unspecified . . . activities."  *Id.* at 239.

GOGP's allegations of injury—involving a diversion of resources from unspecified (presumably government-transparency activities) because of time spent lobbying against the plan to rebuild public housing—are similar to those in *ACORN Fair Housing, NAACP*, and one other fair housing case in which the Fifth Circuit rejected lobbying and legal activities and expenses aimed at defeating a policy as a basis for organizational standing.  *See NAACP*, 626 F.3d at 238–39 (explaining that "examining and communicating about developments in local zoning and subdivision ordinances" do not differ from "routine lobbying activities" and thus do not impart standing); *ACORN Fair Hous.*, 211 F.3d at 305 ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." (quoting *Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994))); *Ass'n for Retarded Citizens of Dallas*, 19 F.3d at

244 (rejecting the argument that an organization having to "direct some of its resources to challeng[e] the allegedly wrongful actions" of another is an "injury in fact" because that argument "implies that any sincere plaintiff could bootstrap standing by expending its resources in response to actions of another").  The complaint alleges that "[t]hough not part of its original goals, in 2009, GOGP's supporters requested that it participate in Galveston's public housing controversy. GOGP began educating itself on the issues surrounding public housing, dedicating its time and resources to this issue and abandoning its other goals."  Plfs.' Second Amended Complaint, Docket Entry No. 81 ¶ 13.  The group's president "has appeared before the Galveston City Council, the Galveston Housing Authority Board, and on PBS Channel 8 TV in Houston" in an attempt to defeat the rebuilding plan but "to no avail."  *Id.*  The alleged injury is that "GOGP has been unable to concentrate on its primary goal of reforming city government due to its focus on the public housing issue and was forced to abandon its earlier projects and goals and divert the vast majority of its resources to fight Defendants' discriminatory plan."  *Id.* ¶ 14.

Compare those allegations to the testimony the court held to be insufficient to establish standing in *ACORN Fair Housing*:

> Again, all I can do is base this on the mission of the organization being frustrated over two and a half years in trying to resolve this particular complaint to the extent that this one complaint

started to take over an inordinate amount of our work time and staff time of our normal activities, really takes away from our activities in other areas, being able to do outreach and education, research and monitoring, intakes and investigations of complaints. . . .

But in terms of frustration of mission, our mission after we resolve the complaint, we have to make up for all that lost ground and all that lost time. . . .

211 F.3d at 305.  As the Fifth Circuit concluded in *ACORN Fair Housing, id*. at 305-06, these allegations fall short of the concrete injury that existed in *Havens* when an organization called "Housing Opportunities Made Equal" alleged that racial steering practices had hindered its efforts "to assist equal access to housing through counseling and other referral services."  455 U.S. at 379.

Allowing GOGP to bring this fair housing suit would result in a more boundless conception of standing than what was rejected in *NAACP, ACORN*, and *Association of Retarded Citizens of Dallas*.  The public housing issue has not allegedly diverted GOGP's resources from expending resources on other fair housing activities or even issue advocacy, but has instead only distracted it from "concentrat[ing] on its primary goal of reforming city government."  Plfs.' Second Amended Complaint, Docket Entry No. 81 ¶¶ 13, 14.  What if a government surveillance program, government support for faith-based initiatives, or a regulation affecting National Forests likewise distracted it from promoting open government?  Then, under this "distraction" theory of organizational standing, it would easily have standing to bring suit challenging that conduct when plaintiffs

with much more of a connection to those issues have struggled mightily, and unsuccessfully, to establish a concrete injury. *See Clapper*, 133 S. Ct. 1138 (rejecting standing for Establishment Clause challenge); *Hein*, 551 U.S. 587 (rejecting standing for challenge to government surveillance); *Summers*, 555 U.S. 488 (rejecting standing for challenge to forest regulation). Even if its focus were constrained to a particular locale like Galveston, could a group sue over any local issue that distracted the group from its core mission whether the issue involved public religious displays, redistricting decisions, or public health ordinances? Standing based on "distraction" from a group's core mission because of its strong opposition to an unrelated policy would thus undo the standing requirement. *See Ass'n of Retarded Citizens of Dallas*, 19 F.3d at 244 ("Advocacy, Inc.'s argument implies that any sincere plaintiff could bootstrap standing by expending its resources in response to actions of another."). As one court explained when considering the implications of another standing argument that would have similarly eviscerated this fundamental limitation on the power of the federal courts: "Individual persons cannot obtain judicial review of otherwise non-justiciable claims simply by incorporating, drafting a mission statement, and then suing on behalf of the newly formed and extremely interested organization." *Nat'l Treasury Emps. Union*, 101 F.3d at 1429.

A group like GOGP that serves as a watchdog over local public officials strengthens our system of self-government.  But that system of self-government would suffer if anyone had standing file a lawsuit challenging a policy merely on the basis that they disagreed with the policy choices enacted after vigorous public debate.  Because it has not suffered a concrete injury from the plan to rebuild Galveston public housing that differentiates it from the numerous people in the Galveston area who have strong views on this issue, GOGP is dismissed from this case for lack of standing.

## III.  CONCLUSION

All plaintiffs except for McCardell are dismissed from the case without prejudice for lack of standing.  The motions to dismiss filed by the defendants (Docket Entry Nos. 35, 45, 50, 54, 71, 78, & 92) therefore are **GRANTED IN PART** and **DENIED IN PART** on the standing issue.  The remaining issues raised in the motions to dismiss will be ruled on at a later date.

**SIGNED** this 30th day of April, 2014.

_____
Gregg Costa
United States District Judge